IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **NORMAN COHEN** | **CIVIL ACTION** |
| *Plaintiff* | |
| | **NO. 13-3295** |
| **v.** | |
| | |
| **METROPOLITAN LIFE INSURANCE COMPANY** | |
| *Defendant* | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                                                          October 16, 2014

## MEMORANDUM OPINION

**INTRODUCTION**

Before this Court are cross-motions for summary judgment filed by Plaintiff Norman Cohen ("Plaintiff"), [ECF 25], and by Defendant Metropolitan Life Insurance Company ("Defendant" or "MetLife"), [ECF 27], pursuant to Federal Rule of Civil Procedure (Rule) 56. These motions stem from Plaintiff's lawsuit brought under the Employment Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. §1101, *et seq.*, wherein Plaintiff seeks a reversal of MetLife's decision to terminate his long-term disability benefits under the Novartis Long-Term Disability Plan ("Plan"). The Plan was established and maintained by Plaintiff's employer, Novartis Corporation ("Novartis"), to provide short-term and long-term disability benefits to its participating employees. MetLife is the claim administrator of the Plan.

For the reasons stated herein, Defendant's motion for summary judgment is granted, and Plaintiff's motion for summary judgment is denied.

**BACKGROUND**

The Plan vests MetLife, as the claims administrator and fiduciary, with the discretionary authority to interpret the terms of the Plan agreement and to determine eligibility for benefits under the Plan. Pertinent to these motions, the relevant Plan provisions stipulate:

> MetLife (as the short-term and long-term disability plan's claims administrator and fiduciary), has the authority and discretion to interpret these plans, to determine all questions arising under or related to the plans, including all questions of fact and questions of obtaining benefits, and to determine the amount, manner, and time of payment of any benefits under the plans. MetLife's decisions are final and binding. (ML 0004).
>
> \*\*\*
>
> Short-term disability and long-term disability benefits are paid by contract with MetLife. In addition, MetLife is responsible for processing and deciding all claims for benefits under these plans, as well as all appeals of denied claims. Benefits are payable under the short-term disability plan or long-term disability plan only if MetLife determines, in its discretion, that the claimant is entitled to them.
>
> MetLife is also the plan's fiduciary under the short-term disability plan and long-term disability plan, which means that MetLife has the authority and discretion to interpret these plans, to determine all questions arising under or related to the plans, including all questions of fact and questions of eligibility to participate and obtain benefits, and to determine the amount, manner, and time of payment of any benefits under the plans. MetLife's decisions are final and binding. (ML 0014).

The Plan defines "disability," as follows:

> By "disabled" or "disability," we mean that because of sickness, pregnancy, or accidental injury you are receiving appropriate care and treatment from a doctor on a continuing basis, and: during your elimination period (see above) and the next 24-month period, you are unable to earn more than 80% of your pre-disability earnings or indexed pre-disability earnings at your own occupation for any employer in your local economy, or after the first 24 months LTD benefits are paid, you are unable to earn more than 60% of your indexed pre-disability earnings from any employer in your local economy at any gainful occupation for which you are

>reasonably qualified, taking into account your training, education, experience and pre-disability earnings. (ML 0007).

The Plan provides a maximum benefit period of 24 months for disabilities that are the result of certain conditions (ML 0008):

>Monthly LTD benefits under this plan are payable for up to a maximum of 24 months during your lifetime if you are disabled because of a mental, nervous disorder or disease or neuro-musculoskeletal or soft tissue disorder, unless the disability results from:
>- Schizophrenia
>- Bipolar disorder
>- Dementia
>- Organic brain disease.

*Plaintiff's Long-Term Disability Claim*

MetLife's interpretation of the limitation for neuromusculoskeletal disorders is at the heart of the parties' dispute. The facts underlying Plaintiff's medical diagnosis and long-term disability claim are generally undisputed and can be summarized as follows:

>On January 8, 2010, Plaintiff contacted MetLife to advise that he was disabled from his employment at Novartis as of December 15, 2009. (ML 0293-296). Plaintiff also informed MetLife that his restrictions and limitations were the result of spinal stenosis, that he would be having a laminectomy within two weeks, and that his treating neurologist was Stephen M. Gollomp, M.D. (ML 0294). MetLife sent a request for information to Dr. Gollomp, who responded that he advised Plaintiff to stop working as of November 5, 2009, had referred Plaintiff to a surgeon for surgical decompression (ML 0282-284), and opined that the cause of Plaintiff's disability was "lumbar spinal stenosis." (ML 0282). Plaintiff was awarded short-term disability benefits.

>On January 22, 2010, Plaintiff underwent an MRI of his lumbar spine which revealed:

>>Diffused degenerative disc disease with disc bulging and facet joint hypertrophy throughout the lumbar spine. Again, there is mild spinal stenosis at L2-3 and L4-5 with moderate stenosis at L3-4. Foraminal stenosis is again indicated at L2-3 through L4-5. There has been no significant interval change. (ML 0277).

3

On March 9, 2010, Plaintiff underwent a lumbar laminectomy secondary to his lumbar spinal stenosis condition which was performed by Paul J. Marcotte, MD. (ML 0268-269).

At about the time his short-term disability benefit were to end, MetLife requested, and Plaintiff provided, the required application forms for long-term disability benefits. (ML 0207-232). In May and June 2010, Plaintiff communicated with MetLife regarding his long-term disability claim, (ML0334-340), and the meaning of a neuromusculoskeletal disorder. MetLife informed Plaintiff that his long-term disability benefits would be limited to 24 months. (ML 335-340).

By letter dated June 21, 2010, MetLife informed Plaintiff that his long-term disability claim had been approved, reiterated the 24 month benefit limitation for neuromusculoskeletal disorder, and advised Plaintiff that "should you remain disabled as defined above, benefits may be paid through July 4, 2012." (ML 0198-199).

An MRI of Plaintiff's lower spine taken on September 7, 2011, revealed the following radiological impression:

> There is a new large laminectomy defect from L2-3 through L4-5. There is degenerative disc disease throughout the lumbar spine. There is no longer evidence for spinal stenosis. There are small posterior osteophytes with accompanying degenerative disc bulges. There is mild enhancing scar formation ventral to the thecal sac at L2-3 and L3-4. There appears to be enhancing scar formation within the left neural foramen at L3-4. No focal herniations are seen. (ML 0141).

The medical notes authored by Eric M. Lipnack, DO, dated October 12, 2011, December 7, 2011, and July 8, 2011, revealed an impression of a failed back syndrome. (ML 0071-76).

By letter dated November 14, 2011, MetLife notified Plaintiff that because the submitted medical documentation "indicated that [Plaintiff was] disabled due to a back disorder," his long-term disability benefits were subject to the 24-month benefit limitation. (ML 0088-89). This notice was repeated by letter dated May 22, 2012, in which MetLife informed Plaintiff that his long-term disability benefits would terminate effective July 4, 2012, based on the Plan's maximum benefit period for disabilities resulting from neuromusculoskeletal or soft tissue disorders, (ML 0048-49), and, again, repeated on June 1, 2012. (ML 0050-51).

By letter dated August 28, 2012, Plaintiff, through counsel, asserted that the Plan language was ambiguous with regard to the neuromusculoskeletal disorder limitation and that MetLife's "analysis as stated in the letter [was] flawed." (ML 0032-34). To this letter, Plaintiff attached correspondence from Dr. Lipnack dated December 16, 2011, which indicated that Plaintiff's "current

4

condition is the result of failed back surgery which was performed to relieve his degenerative disc disease and posterior osteophytes and left him with new scar formations," and Dr. Lipnack's opinion that Plaintiff's "condition is not a result of a neuromusculoskeletal or soft tissue disorder as defined in [the] policy." (ML 0037).

Between October 1, 2012, and January 10, 2013, Plaintiff's counsel wrote to MetLife four more times, without receiving any substantive response from MetLife. (ML 0025-031). On February 5, 2013, MetLife's representative spoke with Plaintiff's attorney and advised that the limited benefit period applied to Plaintiff's diagnosis for failed back surgery. (ML 0466).

By correspondence dated July 2, 2013, MetLife upheld its claim determination, and delineated the terms relied upon, the content of the medical records submitted, and concluded as follows:

> We conducted an additional review of the medical information in Mr. Cohen's claim at your request. We determine that Mr. Cohen's diagnosis of failed back surgery, lumbar spine pain with radiation to lower extremities, lumbar sacral spondylosis, degenerative disc disease throughout the lumbar spine, lumbar disc bulges and bilateral lumbosacral radiculopathy are limited to a maximum of 24 months of benefits, as they are neuro-musculoskeletal conditions. (ML 0021).

**LEGAL STANDARD**

Pursuant to Rule 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation. A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Under Rule 56, the court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

Further, Rule 56 provides that the movant bears the initial burden of informing the court of the basis for the motion and identifying those portions of the record which the movant "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986). This burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.*, at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." *See* Rule 56(c)(1)(A-B). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 476 U.S. 574, 586 (1986). The nonmoving party may not rely on bare assertions, conclusory allegations or suspicions, *Fireman's Ins. Co. of Newark v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982), nor rest on the allegations in the pleadings. *Celotex,* 477 U.S. at 324. Rather, the nonmoving party must "go beyond the pleadings" and by either affidavits, depositions, answers to interrogatories, or admissions on file, "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*

## DISCUSSION

Courts review a denial or termination of ERISA benefits under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine a claimant's eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). In cases where a plan administrator exercises discretion, "[t]rust principles make a deferential standard of review appropriate" and courts reviewing that

6

exercise of discretion must do so under the arbitrary and capricious standard. *Stratton v. E.I. DuPont De Nemours & Co.*, 363 F.3d 250, 254 (3d Cir. 2004) (quoting *Firestone*, 489 U.S. at 111-12).[1] Under the arbitrary and capricious standard, a district court must defer to the administrator unless the administrator's decision is clearly unreasonable, not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan. *Abnathya v. Hoffman La-Roche, Inc.*, 2 F.3d 40, 41 (3d Cir. 1993). A claimant bears the burden of establishing that he is entitled to additional long-term disability benefits under a plan and that the administrator's claim determination was an abuse of discretion. *Mitchell v. Eastman Kodak Co.*, 113 F.3d at 439-440.

In this case, the parties do not dispute that MetLife had the authority and the discretion to determine eligibility for benefits. Therefore, the arbitrary and capricious standard of review is applicable.

*MetLife's Interpretation and Application of the 24-Month Benefit Limitation*

In terminating his long-term disability benefits, MetLife determined that Plaintiff's disabling condition was a neuromusculoskeletal disorder, subject to the Plan's 24-month benefit limitation. Plaintiff contests this determination and argues that MetLife incorrectly classified his disabling condition as a neuromusculoskeletal *disorder* and further, that MetLife's interpretation of the term is unreasonable. Plaintiff differentiates that he suffers from a neuromusculoskeletal *disease*, *i.e.*, degenerative disc disease and failed back syndrome, and not from a neuromusculoskeletal *disorder* and, thus, is not subject to the 24-month benefit limitation. At

---

[1] The Third Circuit has clarified that "[i]n the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 n. 2 (3d Cir. 2011).

issue, therefore, is the meaning of "neuromusculoskeletal disorder" and whether MetLife reasonably determined that Plaintiff's disability falls within the meaning of this term.

An administrator's interpretation of a plan is not arbitrary if it is "reasonably consistent with unambiguous plan language." *Bill Gray Enters. v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001). When a plan's language is ambiguous and the administrator is authorized to interpret it, district courts "must defer to this interpretation unless it is arbitrary or capricious." *McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan*, 340 F.3d 139, 143 (3d Cir. 2003). "The determination of whether a term is ambiguous is a question of law. A term is ambiguous if it is subject to reasonable alternative interpretations." *Taylor v. Cont'l Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1233 (3d Cir. 1991).

Plaintiff challenges MetLife's termination decision and argues that his various diagnoses and back conditions constitute a disease, rather than a disorder, and points to his diagnosis for degenerative disc disease in support. While the terms "disease" and "disorder" arguably have different dictionary definitions, Plaintiff's reliance on these purported differences is misplaced.[2]

As noted by both parties in their briefs, this precise issue regarding the definition and interpretation of "neuromusculoskeletal disorder" was addressed in *Bland v. Metropolitan Life Ins. Co.*, 2013 WL 56117 (M.D. Ga. Jan. 3, 2013), a case which involved the interpretation of the

---

[2] Notably, the *Roget's International Thesaurus* (5th ed.) lists "disorder" as a synonym for "disease." In addition, *Stedman's Medical Dictionary* (28th ed.) defines the two terms similarly, to *wit*:

**Disease**: An interruption, cessation, or *disorder* of a body, system, or organ structure or function.
**Disorder**: A disturbance of function, structure, or both, resulting from a genetic or embryonic failure in development or from exogenous factors such as poison, trauma, or *disease*. (emphasis added).

As such, this Court finds that these terms are often used interchangeably within the medical field.

8

same long-term disability limitation at issue here. Though the *Bland* decision is not binding on this Court, we find its analysis and reasoning persuasive.

In *Bland*, the plaintiff, as did Plaintiff here, contested MetLife's classification of her disabling condition as a neuromusculoskeletal disorder. *Id.* at *5. The plaintiff argued that no treating physician had specifically diagnosed her with a neuromusculoskeletal disorder and that the term was "rarely used in mainstream medicine." *Id.* In rejecting the plaintiff's arguments, the district court found that the term was neither vague nor ambiguous. *Id.* To the contrary, the *Bland* court found that numerous other courts "have had little difficulty in deciphering its meaning," and found that it includes "any neck or back injury no matter how certain it is that a Novartis employee is truly disabled." *Id.* (citing other decisions in which the term was addressed); *see also Moberg v. Phillips Electronics North America Corporation Group Welfare Benefit Plan*, 2013 WL 6048909, at *3 (W.D. Ark. Nov. 15, 2013) (looking to medical dictionary definitions and finding that neuromusculoskeletal "refers to not only nerves and muscles but also the skeleton, and that, of course, includes the spine."), *aff'd*, 2014 WL 3973359 (8th Cir. 2014).

In also turning to various medical term dictionaries and resources, this Court notes the following definitions of the relevant terms and/or their roots:

> **Neuromuscular**: Referring to the relationship between nerve and muscle, in particular to the motor innervation of skeletal muscles and its pathology. *Stedman's Medical Dictionary* (28th ed.).
>
> **Musculoskeletal**: Relating to muscles and to the skeleton . . . . *Id.*
>
> **Neuromusculoskeletal**: Pertaining to or affecting the nervous, muscular, and skeletal systems. *Dorland's Illustrated Medical Dictionary* (32nd ed.).
>
> **Musculoskeletal disorders**: injuries or disorders of the muscles, nerves, tendons, joints, cartilage, any disorders of the nerves, tendons, muscles and supporting structures of the upper and lower limbs, neck, and lower back that are caused, precipitated or exacerbated by sudden exertion or prolonged exposure to physical factors such as repetition, force, vibration, or awkward

9

posture. (This definition specifically excludes those conditions such as fractures, contusions, abrasions, and lacerations resulting from sudden physical contact of the body with external objects). National Institute for Occupational Safety and Health ("NIOSH") http://www.cdc.gov/niosh/programs/msd/.[3]

Under these common definitions, this Court finds that MetLife's determination that Plaintiff's disability fell within the neuromusculoskeletal disorder limitation was a reasonable determination. The parties do not dispute, and the administrative record confirms, that Plaintiff suffered from various lumbar and/or spine ailments, as well as degenerative disc disease. As these conditions all relate to conditions involving Plaintiff's "nerves, muscles and supporting structures of the upper and lower limbs, neck and lower back," these ailments fall within the broad definition of neuromusculoskeletal disorder. Thus, MetLife's determination was not made in an arbitrary or capricious fashion.

Plaintiff also argues that MetLife ignored the opinion of Dr. Lipnack, one of Plaintiff's treating physicians, when determining that Plaintiff's disability fell within the classification of a neuromusculoskeletal disorder. In his letter to MetLife dated December 16, 2011, (ML 0037), Dr. Lipnack opined that Plaintiff's condition was "not a result of a neuro-musculoskeletal or soft tissue disorder as defined in his policy." Dr. Lipnack opined that Plaintiff's condition was "a result of failed back surgery which was performed to relieve his degenerative disc disease and posterior osteophytes . . . ." Because Plaintiff's condition as described by his own treating physicians (including Dr. Lipnack) falls within the broad definition of neuromusculoskeletal disorder, this Court finds that MetLife's determination reasonable and supported by substantial evidence. Contrary to Plaintiff's contention, the administrative record reveals that MetLife did

---

[3] NIOSH is the U.S. federal agency that conducts research and makes recommendations to prevent worker injury and illness.

in fact consider the medical reports and opinions of Dr. Lipnack, who was referenced several times in its' July 2, 2013, letter. (ML 0016-22). Therefore, this contention is without merit.

*MetLife's Alleged Procedural Irregularities*

Plaintiff also contends that MetLife "failed to follow proper procedures to such an extent that it failed to satisfy its fiduciary obligations to Plaintiff." Specifically, Plaintiff argues that MetLife: (1) failed to obtain and consider medical records regarding Plaintiff's urinary and hernia conditions and whether those conditions entitled him to long-term disability benefits; and (2) refused to communicate with Plaintiff's counsel with respect to his claim. Based on a review of the administrative record, these arguments are without merit.

While Plaintiff suggests that MetLife had a duty to affirmatively investigate Plaintiff's urinary and hernia conditions and to consider whether these conditions independently constituted disabling conditions, Plaintiff has provided no legal support for such duty. Case law in this jurisdiction holds that plan administrators have no such duty where the applicable plan, like the one here, requires the claimant to submit medical evidence to support eligibility for benefits. *See e.g., Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 46 (3d Cir. 1993).

Regardless, the evidence of record, particularly MetLife's letter of July 2, 2013, reveals that MetLife not only considered Plaintiff's urinary and hernia conditions, but invited Plaintiff to submit additional medical records to support his claims regarding these conditions. To that extent, the letter reads:

> We are unable to determine, based on the medical information submitted for review, whether there were ongoing functional impairments as of the time that Mr. Cohen's claim reached the maximum benefit payment of 24 months for urinary incontinence or bilateral inguinal hernias on July 4, 2012. If you wish to submit additional medical information regarding these conditions, we would complete an additional review to determine what functional

11

> impairments Mr. Cohen had as a result of the diagnoses of urinary
> incontinence or bilateral inguinal hernias. (ML 0020-21).

Plaintiff could have supplemented his claim by submitting additional documentation evidencing that he was disabled as a result of urinary incontinence or bilateral inguinal hernias. A review of the record shows that he did not.

Lastly, Plaintiff contends that MetLife violated procedures by failing to communicate with Plaintiff's counsel regarding his claim. Specifically, Plaintiff asserts, and the record reflects, that MetLife did not respond to Plaintiff's counsel's letters for more than five (5) months. (ML 0023). Plaintiff has provided no support to establish that this five-month delay in communication violated ERISA or his rights in any way. As set forth above, this Court finds that MetLife's claim determination is supported by substantial evidence and is not contrary to the terms of the Plan or applicable law.

## CONCLUSION

Based on the foregoing, this Court finds that MetLife's decision to terminate Plaintiff's benefits was not arbitrary and capricious, was supported by substantial evidence in the administrative record, and was made in accordance with the terms of the Plan. Accordingly, Defendant's motion for summary judgment is granted, Plaintiff's motion for summary judgment is denied, and judgment is entered in favor of Defendant and against Plaintiff. An order consistent with this memorandum opinion follows.

NITZA I. QUIÑONES ALEJANDRO, U.S.D.C. J.